### No. 12,213.

IN THE MATTER OF LEEDS & CO., LIMITED, IN LIQUIDATION. OPPOSITION TO PROVISIONAL ACCOUNT OF RECEIVERS AND LIQUIDATING COMMISSIONERS.

Liquidating commissioners of a defunct corporation have no standing in court to contest the legality of the acts of copartnerships upon which it is founded, whose assets it took possession of, and whose indebtedness it assumed and promised to pay.

When, in the course of the dealings and business of a commercial partnership, accounts with its customers are periodically cast up and stated, and interest at the rate of eight per cent. is computed upon such balances as may be found due, and carried into future settlements as part of the capital, the receivers of a subsequently organized corporation into which each partnership has been merged has no right of action to overhaul same upon a claim that usurious interest has been charged.

In the Matter of Leeds & Co., Limited, in Liquidation.

This is not the ordinary case of a debtor resisting the demand of a creditor upon the ground that he has been charged usurious interest, but that of liquidating commissioners of an insolvent corporation seeking to avoid *acts* of partnership while it was in operation, as well as those of the corporation itself while it was a going concern, upon the theory that same were prejudic..al to the interests of ordinary creditors of the corporation whom they chose to recognize, and whose rights they have undertaken to champion, in opposition to others who are creditors of the corporation, and were, for many years previous, creditors of the partnership.

A case thus circumstanced must be regarded as standing in an attitude before the court somewhat like that of a revocatory action.

The Code declares, that if any one shall pay a higher rate of interest than five per cent. per annum, he may sue for and recover the same back within twelve months from the time of such payment, and that declaration clearly signifies that the legislative purpose was to bring such a right of action within the shortest reasonable limit, as a means of discouraging same as far as it was practicable, and of compelling a resort to this method of relief while the transactions were of recent origin, and proof of them within easy reach.

Within the intendment of the declaration of the Civil Code, Art. 2924, that the rate of eight per centum "must be fixed in writing," we do not consider it even a doubtful proposition, that a debtor and creditor may deal with their accounts as they choose, and compute and carry into a settlement thereof any amount of interest they please—the only restraint it places upon the *contracting* power of parties being, that they shall not stipulate for the payment of more than *eight per cent. after maturity*.

When, in the liquidation and settlement of a commercial partnership its assets and property are regularly transmitted to a corporation which assumes all partnership liabilities, the liquidating commissioners of the corporation can not evade the legal effect of same upon the ground that the transaction was a nullity, because one of the members of the partnership and one of the stockholders of the corporation was the husband of one of the principal creditors of both.

It is elementary that the mere acceptance and personal use of the wife's funds creates an indebtedness in her favor and against her husband, and that the husband being legally capacitated to administer his wife's paraphernal property, he is competent to administer same as mandatory, and without any formal power of attorney. the husband's management of his wife's affairs being regarded as sufficient, if known to and acquiesced in by her.

In the instant case the wife's paraphernal funds having first gone into the partnership of which her husband was a member, and afterward into the corporation of which he was and is a shareholder, and been used in their business, several important consequences flow from their transactions, viz.:

*First*—The establishment of the debt of the husband to the wife, he being a stockholder in the corporation, and having been a member of the different partnerships previously.

*Second*—That said indebtedness remains absolutely imprescriptible in so far as the husband is concerned, so long as the marriage exists, between him and his wife as the creditor, notwithstanding the latter be judicially separated from him.

*Third*—That same being the indebtedness of a commercial partnership, every member of same becomes liable therefor *in solido*.

*Fourth*—That acknowledgment of one debt or *in solido* legally interrupts prescription as to all others.

*Fifth*—That Charles J. Leeds became personally bound by all the legal acts which were done by the partnerships of which he was a member; and he, likewise, became bound by the lawful act of the corporation of which he was a shareholder, in assuming and contracting to pay the same.

APPEAL from the Civil District Court for the Parish of Orleans. *Monroe, J.*

*Benjamin Rice Forman* and *Hugh C. Cage* for Receivers and Unsecured Creditors, Appellants.

*W. S. Benedict* for Beattie Heirs; *B. K. Miller* for Canal Bank; *Carroll & Carroll* for Mrs. Charles J. Leeds, Mrs. Sarah A. Leeds, Miss Helen Leeds and Carroll & Carroll, Opponents, Appellees.

Argued and submitted December 16, 1897.
Opinion handed down February 1, 1897.
Rehearing refused March 29, 1897.

The opinion of the court was delivered by

WATKINS, J.   The account of the liquidating commissioners proposes for distribution among certain creditors thereon enumerated the sum of twenty-five thousand and seventy-two dollars and eighty-three cents, the total amount of the claims of acknowledged creditors being fifty-three thousand nine hundred and three dollars and twenty-three cents, on which a pro rata distributive share is to be paid.

At the foot of the account is placed the following statement, as a memorandum, to-wit:

" The following claims are on the books, but are not put on the foregoing account and list of liabilities, because the receivers do not agree as to them, Mr. John P. Baldwin being of the opinion that they should be recognized as liabilities and entitled to share in the dividend, and Mr. Henry Rennyson being of opinion that they should not:

In the Matter of Leeds & Co., Limited, in Liquidation.

| | |
|---|---:|
| " Mrs. M. J. Leeds, $21,430.12 and interest | $31,430 73 |
| " Mrs. G. W. Beattie | 1,936 04 |
| " J. B. Beattie | 1,936 04 |
| " Mrs. P. B. Leeds | 4,285 70 |
| " William Beattie | 1,936 04 |
| " Mrs. G. W. Noyes | 180 00 |
| " Total | $41,704 60 |
| " etc." | |

To the foregoing account several oppositions were filed, not contesting the correctness of the account, but claiming that opponent's demands were improperly omitted from the list of creditors entitled to participate in the funds which were thereon marshaled for ratable distribution.

On the trial there was judgment sustaining certain of the oppositions, viz.:

1. That of Mary Josephine Rawle, wife of Charles J. Leeds, so as to recognize her as an ordinary creditor of Leeds & Co., Limited, in the sum of thirty-two thousand five hundred and twenty-eight dollars and eleven cents with interest thereon at eight per cent. from January, 1895; and as an ordinary creditor for such further sum as may be still due her on her claim of six thousand three hundred and sixty-nine dollars and thirty-five cents with like interest from the 18th of July, 1894, as recognized in the suit of the Canal Bank, subrogee, vs. Leeds & Co., Limited, after payment to her of her pro rata share of the proceeds of sale of the mortgaged property therein involved.

2. That the opposition of William Beattie be maintained in so far as to recognize him as an ordinary creditor in the sum of fourteen hundred and fifty-four dollars and sixty-nine cents with six per cent. interest from April 1, 1894, less certain reductions.

3. That the opposition of John B. Beattie be maintained in so far as to recognize him as an ordinary creditor in the sum of nineteen hundred and thirty-six dollars and eight cents with interest at six per cent. from April 1, 1894, less certain reductions.

4. That the opposition of Giles W. Beattie be maintained in so far as to recognize him as an ordinary creditor in the sum of nineteen hundred and thirty-six dollars and four cents with six per cent. interest from the 1st of April, 1894, less certain reductions.

5. That the opposition of Mrs. Sarah Avery, widow of Paul B. Leeds, be maintained in so far as to recognize her as an ordinary creditor in the sum of four thousand two hundred and eighty-five dollars and seventy cents with six per cent. interest thereon from April 1, 1894, less certain reductions.

6. That the opposition of Helen Leeds be maintained in so far as to recognize her as an ordinary creditor in the sum of one hundred and eighty dollars with six per cent. interest thereon from the 1st of April, 1894.

7. That the opposition of Wood, Schneidau & Co. be maintained in so far as to direct that the receivers hold in reserve for *future* disposition whatever dividend may, agreeably to the present scheme of distribution, be attributable to an indebtedness of four thousand nine hundred and fifty-three dollars and twenty cents in the event it be ascertained that so much is actually due them.

8. That the opposition of Carroll & Carroll be maintained, so as to recognize them as privileged creditors in the sum of six hundred dollars.

Certain other oppositions, which require no special mention, were maintained, and others disallowed, and the account was homologated conformably to this decree; and from the decree Mrs. Charles J. Leeds, the liquidating commissioners, and one or two others, unnecessary to be mentioned, prosecute appeals.

In this court Wood, Schneidau & Co. have filed an answer to the receiver's appeal, and pray that the judgment appealed from be so amended as to conform to their opposition—that is to say, that they be placed upon the provisional account as ordinary creditors for the full sum of four thousand and fifty three dollars and twenty cents, and entitled to a pro rata distribution with other creditors thereon.

## I.

The first question—and possibly the most important one—which meets us at the threshold of this case, is as to the correctness of the judgment of the court *a qua* in respect to the claim of Mrs. Mary Josephine Rawle, wife of Charles J. Leeds, for the sum of thirty-two thousand five hundred and twenty-eight dollars and eleven cents.

The foundation of this claim is the loan of a sum of money by Mrs. Charles J. Leeds—out of her paraphernal funds, under her administration and control—to the firm of Leeds & Co.; and that same remained in their possession and use throughout its many changes and transformations, during a period of over forty years; and that same is evidenced by proper entries made in the books of Leeds & Co., and of their different successors and assigns—showing the interest, charges and computations and credits for partial payments

made on account, resulting in the balance claimed in her opposition.

It will be perceived at once, as the account admits, that the opponents' claim is regularly placed upon the books of the commercial firms of Leeds & Co. and upon those of the corporation of Leeds & Co., Limited; that there is no question of the *primary existence* of the debt, notwithstanding Charles J. Leeds was a member of the partnership and a shareholder of the corporation; but, admitting the existence of an indebtedness of the partnership first and of the corporation afterward, the contention of counsel for the liquidating commissioners is that interest should have been computed and charged at the rate of five per cent. per annum from the commencement to the end of the running account—resulting in a total debit balance of seven thousand four hundred and forty-nine dollars and one cent in favor of opponent.

On the other hand, the contention of opponent's counsel is that the accounts of the partnership and of the corporation with Mrs. Leeds were periodically cast up, and interest at eight per cent. was computed thereon and carried into the account as capital; and that upon the balance thus ascertained eight per cent. interest was again calculated, and this process being continued from year to year, credits being deducted, the balance claimed was produced.

It will be observed that this is not the ordinary case of a debtor resisting the demand of a creditor, upon the ground that he has been charged usurious interest; but that of liquidating commissioners of a defunct corporation, resisting these corporate acts, while it was a going concern, upon the theory that they were prejudicial to the mass of its creditors.

The case stands, and must be considered, as one in the nature of a revocatory action, as our judgment, if it supports the contention of commissioners, must declare the acts which are complained of illegal and void. Allen, West & Bush vs. Nettles, 39 An. 788.

It is further to be observed that the funds in court are marshaled for distribution pro rata amongst various *ordinary creditors* of the corporation, from participation in which the commissioners' account has excluded opponents altogether, upon the ground stated—opponents making claim as ordinary creditors of the corporation.

The view of the controversy first presented is one of law; and that being disposed of adversely to the contention of the commis-

sioners, it then becomes a question of fact, in considering and deter-mining which we must decide as to the competency and admissibility of the evidence.

From the record it appears that the account of Mrs. M. J. Leeds was opened with the commercial partnership of Leeds & Co. on the 15th of October, 1857, by the loan of four hundred and fifty-four dollars and fifty-five cents, and this was succeeded by another loan of one thousand two hundred and sixty-two dollars and sixty-three cents on the 5th of March, 1858; and against this she was debited with the sum of twenty-two dollars and fifty cents on the 30th of June, 1858.

During the years succeeding to the year 1873, there were various other loans of money made to Leeds & Co. by Mrs. M. J. Leeds, and various amounts were paid to her by the partnership; and the books of the firm show corresponding entries.

During the years intervening between that date (1873) and 1880, there seems to have been no transactions—everything having remained in *statu quo* in the meantime.

About February, 1881, there was a reorganization of the partner-ship, and a change of the membership thereof; but the new firm took up the account of Mrs. Leeds, and continued to receive from her loans of money, and to make partial payments to her on account, from the time of the reorganization until the year 1888.

Soon afterward the partnership was again reconstructed and passed into a limited corporation under a statute of the State; and this cor-poration, in its turn, took up the account of Mrs. Leeds and contin-ued to receive loans of money from her, and to make partial pay-ments to her, during the several succeeding years, and prior to the commencement of the liquidation of the corporation.

It was during the course of these transactions that the computa-tions of interest were made and partial settlements were declared, of which the liquidators urge complaint; and the burthen of their com-plaint is, that *ordinary* creditors of the corporation, whose claims are of manifest *recent origin*, would be necessitated to receive a smaller distributive share, if such computation of interest and such settle-ments are approved of as legal and valid.

It is not suggested that either partnership was insolvent, or even in embarrassed circumstances at the time, or that the partnership was not perfectly competent, in every way, to deal with the account

as they chose, and make such settlements with their creditors as they chose.

And it appears that the corporation, having been organized only three or four years prior to its liquidation, the scope of the inquiry could not legitimately extend any further back than its organization; and within that limit there was no item of credit for money advanced by Mrs. Leeds, and only three partial payments made on account, aggregating one thousand one hundred and ten dollars in amount.

The Code declares that if any one shall pay a higher rate of interest than five per cent. he may sue for and recover same back within twelve months from the time of such payment (R. C. C. 2924) ; and this declaration clearly signifies that the Legislature intended to bring such a right of action within the shortest possible limit, as a means of discouraging same as far as practicable, and of compelling a resort to this method of relief, while the transactions were of recent origin and the proof of them within easy reach. Baker vs. Towles' Administratrix, 11 La. 433; Heirs of McGehee vs. McGehee, 41 An. 659; Wood vs. Egan, 39 An. 685; Cutler vs. Succession of Collins, 37 An. 95.

Leaving out of view, for the present, the *policy* of the law, and attending to the question of law under consideration, we find the Code declares that the rate of legal interest is fixed at five per cent. and that of conventional interest at eight per cent., and that the latter " *must be fixed in writing.*" *Id.* 2924. (Our italics.)

The phrase, " must be fixed in writing," is especially significant, in this connection, as the further declaration of the Code is that the whole amount of a demand is collectible, when supported by such " written evidence of debt for the payment of money," notwithstanding same " may include a greater rate of interest than *eight* per cent. per annum; provided such obligation shall not bear more than eight per cent. *per annum after maturity* until paid."

We do not consider it even doubtful that a debtor and creditor can deal with their accounts as they choose, and compute and carry into a settlement thereof any amount of interest they please within the letter or reasonable intendment of that article.

The only restraint it imposes upon the *contracting* power of parties is that they shall not stipulate for the payment of more than *eight per cent. after maturity.*

Undoubtedly the rate of interest was " *fixed in writing* " by Leeds

& Co., by computing it and charging the firm therewith. It did not exceed eight per cent. per annum at any time, either in the settlements they made or on the running account after settlement. Bank of Louisiana vs. Stansbury, 8 La. 262; Thompson vs. Mylne, 4 An. 206, *post.*

This was in the nature of an allowance of a higher rate than that of legal interest as a consideration of an extension of time for the payment of the principal, which is not considered usurious. Foster vs. Wise, 27 An. 538.

The question of the right of a creditor to compute and carry into an open and running account interest at the rate of eight per cent. was very carefully considered and decided by this court in Allen, West & Bush vs. Nettles, 39 An. 788, and our opinion therein is prefaced by the statement that, in the course of the business dealings of the parties, " accounts and statements had been frequently rendered (to the defendant) informing him fully of the nature of the charges made against him, and balances had been frequently struck and carried forward into new accounts. He received these accounts and never made any objection to them." And the opinion then proceeds:

" Defendant now seeks to overhaul these accounts from 1881, and claims and was allowed a deduction of four hundred and seven dollars and one cent for overcharges of interest, resulting from the charge of eight per cent. interest and from the compounding thereof by capitalizing, in the succeeding accounts, the balances from those preceding. We think this was an error. So far as these matters are concerned, the defendant can not go beyond the accounts which have been rendered to and accepted by him without objection. Parol evidence can not be received to prove a convention to pay eight per cent. interest; but when such charges have been made, and an account containing them has been rendered and accepted, the account becomes an account stated; the balance represents a settlement between the parties, to pay which a promise is implied, and such settlement can no more be impeached on the ground that such charges are included therein *than if the account had been paid and the action had been to recover them.*"

In that opinion quite a number of previous decisions of this court were cited as authority for propositions therein maintained; and their correctness has been frequently affirmed since. Applying that

doctrine to the facts of the instant case it seems to have a stronger and fitter application, because the *debtor party prepared the books and made the entries upon which the settlements and interest calculations were predicated.*

It may, however, be both interesting and instructive to look into and collate some of the adjudications upon the subject for the benefit of jurisprudence.

Commencing with decisions which were rendered long anterior to the formation of the first partnership of Leeds & Co., we find the precepts announced in Allen, West & Bush vs. Nettles fully in accord therewith.

For instance, in Millaudon vs. Sylvester, 8 La. 262, the court said:

"The third objection was made on an allegation that compound interest was allowed on a balance of thirty-seven thousand dollars.

"This objection we are of opinion was correctly overruled.

"The plaintiff appears to have made up his account current with the partnership in which interest is charged and presented it to the firm, and this account with the items of interest, now deemed objectionable, were transcribed into the partnership books kept by Sylvester & Son, which were always under their direction and control and assigned by them."

So, in the instant case were the accounts of Mrs. Leeds spread upon the books of Leeds & Co., and were always under their direction and control; and upon those books were the computations of interest carried into periodical settlements.

And the opinion further states, viz.:

"So, when partners, by the articles of partnership, fix the rate of interest to be charged by them at six per cent., and a partner renders an account for advances to the firm, and charges interest at ten per cent., which the partners having the direction of the firm receive, and enter upon the partnership books, *it is written evidence to their assent to that rate of interest.*"

In White vs. Henderson, 2 An. 241, it was held that "by Art. 1934 of the Civil Code, a contract to pay compound interest is lawful, if made after the interest has accrued."

In Thompson vs. Mylne, 4 An. 206, it was held:

"At the end of the year a balance of accounts and a balance of interest was struck, and carried together to a new account, thus calculating capital and interest upon the whole.

"This mode of stating the accounts was rejected by the creditors

In the Matter of Leeds & Co., Limited, in Liquidation.

as being in violation of Art. 1934 of the Civil Code; and the ques-
tion now submitted is whether that article is applicable to mer-
chants' accounts," and the court held it was not.

Again:

"By the general commercial law, when the custom of the place
and the practice of the parties is to strike a balance of their
accounts at fixed periods, and to render the account, the balance,
composed of principal and interest to date, is viewed as the capital
of the creditor, on which he is entitled to charge interest from
that date.   Acquiescence in an account so rendered, though not *per
se* an agreement to it, is evidence from which it may be inferred that
the party who received it without objection agreed to continue the
same course of dealing, and to retain the balance on paying interest."

In Sentell vs. Kennedy, 29 An. 679, it was held:

" When a factor's account is closed, stated and rendered at the end
of the commercial year, and not objected to by his client, showing a
balance in his favor composed of principal and *accrued interest*, on
such balance interest may be charged in any subsequent accounts
between the parties.

" Interest on such balance is not compound interest."

Again:

". When a principal has dealt with a merchant through an agent
acting under a power of attorney, the merchant may prove by parol
the correctness of his account, and any acknowledgment of its cor-
rectness, or any ratification of it by the principal, even if the agent
has transcended his mandate, or there are charges in the account
which could not be legally made.   *   *   *

" Ratification by the principal of the unauthorized acts of his agent
makes those acts binding on the principal."

But, perhaps, the most opposite opinion of this court is that in the
case of Slidell vs. Pritchard, 5 Rob. 101, from which we extract the
following, viz.: " And we can see no good reason why an assignee
should acquire any greater right.   He must prosecute the defence of
the suit as he found it; and it seems to us that the plea that the pay-
ment made was injurious to the defendant's *new* creditors can not
avail the assignee, whose duty i is to exercise the rights and actions
of the bankrupt in the situation in which he finds them at the time of
the bankruptcy."

We are of opinion that the foregoing authorities effectually dispose
of the question of law. and adversely to the contention of counsel for

the liquidators, and that, as between debtor and creditor, or factor and customer, they must be accepted as conclusive.

The facts of this case may be taken historically, and may be more concisely related in narrative form; and same may be premised by the statement of the accounts as they appear in the brief of counsel for the liquidators, as furnishing an object lesson, without accepting their conclusions as correct. They are as follows, viz. :

MRS. M. J. LEEDS IN ACCOUNT WITH LEEDS & CO.

No. 1.

| | | | | | Int. to Feb. 1, 1897, at 5 per cent. |
|---|---|---|---|---|---|
| | | *Credit.* | | | |
| 1857—Oct. | 15. | By cash | | $454 55 | $890 90 |
| 1858—March | 5. | " | | 1,262 63 | 2,404 08 |
| July | 13. | " | | 10 00 | 19 27 |
| Aug. | 27. | " | | 110 00 | 211 27 |
| 1859—Jan. | 15. | " | | 8 00 | 15 22 |
| March | 3. | " | | 55 00 | 104 27 |
| July | 13. | " | | 489 58 | 917 20 |
| Aug | 10. | " | | 110 00 | 206 70 |
| 1860—Jan. | 11. | " | | 8 00 | 14 10 |
| Feb. | 9. | " | | 55 00 | 101 70 |
| May | 31. | " | | 883 33 | 1,618 95 |
| July | 10. | " | | 8 00 | 14 50 |
| Aug. | 10. | " | | 110 00 | 210 00 |
| 1861—Jan. | 16. | " | | 8 00 | 14 41 |
| Feb. | 30. | " | | 55 00 | 98 75 |
| May | 31. | " | | 511 00 | 902 80 |
| July | 17. | " | | 8 00 | 14 05 |
| Aug. | 12. | " | | 110 00 | 194 90 |
| Sept. | 14. | " | | 434 58 | 768 23 |
| 1862—March | 15. | " | | 63 00 | 118 85 |
| 1873—June | 28. | From succession E. Grinnell | | 3,793 00 | 4,472 60 |
| 1874— | | Nothing | | | |
| 1875— | | " | | | |
| 1876— | | " | | | |
| 1877— | | " | | | |
| 1878— | | " | | | |
| | | | | $8,546 67 | $13,303 56 |
| | | *Debit.* | | | |
| 1857— | | Nothing | | | |
| 1858—June | 30. | To cash | | $22 50 | $43 40 |
| 1859—Jan. | 12. | " | | 99 50 | 190 00 |
| May | 9. | " | | 45 50 | 80 75 |
| June | 30. | " | | 27 00 | 50 74 |
| Aug | 13. | " | | 55 00 | 102 60 |
| 1860—March | 27. | " | | 18 00 | 33 15 |
| July | 10. | " | | 2,691 75 | 4,920 59 |
| July | 25. | " | | 34 00 | 62 05 |
| 1861— | | Nothing | | | |
| 1862— | | " | | | |
| 1863— | | " | | | |
| 1864 Dec. | 17. | To cash | | 25 00 | 40 20 |
| 1865—Oct. | 9. | " | | 200 00 | 312 84 |
| 1866—Jan. | 16. | " | | 100 00 | 155 80 |
| 1866—Jan. | 25. | " | | 250 00 | 387 80 |
| 1867— | | Nothing | | | |
| 1868—Aug. | 17. | To cash | | 50 00 | 85 38 |
| 1869— | | Nothing | | | |
| 1870—Jan. | 3. | To cash | | 60 00 | 80 80 |
| 1871—March | 7. | " | | 50 00 | 65 80 |
| 1872— | | Nothing | | | |
| 1873—Feb. | 28. | To cash | | 50 00 | 59 75 |
| 1874— | | Nothing | | | |
| 1875— | | " | | | |
| 1876— | | " | | | |
| 1877—Nothing | | | | | |
| 1878— | " | | | | |
| | | | | $3,788 25 | $6,671 65 |

In the Matter of Leeds & Co., Limited, in Liquidation.

### MRS. M. J. LEEDS IN ACCOUNT WITH LEEDS & CO.

#### No. 2.

*Credit.*

|  |  |  |  | Int. to Feb. 1, 1897, at 5 per cent. |
|---|---|---|---|---|
| 1879— |  | Nothing | ......... | ......... |
| 1880— | " | " | | |
| 1881—Feb. | 21. | By cash | $64 02 | $50 22 |
| April | 12. | " | 106 21 | 83 91 |
| July | 9. | " | 102 48 | 79 48 |
| Oct. | 21. | " | 118 34 | 90 25 |
| 1882—Jan. | 11. | " | 120 63 | 90 66 |
| April | 18. | " | 88 73 | 63 57 |
| May | 13. | " | 409 89 | 301 16 |
| July | 7. | " | 110 93 | 80 44 |
| Oct | 6. | " | 89 48 | 63 66 |
| 1883—J·n. | 6. | " | 118 52 | 82 90 |
| Jan. | 15. | " | 59 26 | 41 50 |
| April | 7. | " | 101 10 | 69 65 |
| April | 11. | " | 50 54 | ......... |
| July | 10. | " | 103 33 | 34 87 |
| Oct. | 8. | " | 101 86 | 67 89 |
| 1884—Jan. | 5. | " | 138 50 | 90 42 |
| Jan. | 14. | " | 56 25 | 45 50 |
| April | 8. | " | 103 64 | 66 38 |
| July | 7. | " | 151 67 | 93 83 |
| Oct. | 6. | " | 91 19 | 56 30 |
| 1885—Jan. | 10. | " | 136 30 | 82 08 |
| May | 25. | " | 204 66 | 119 46 |
| Sept. | 24. | " | 76 14 | 42 40 |
| Oct | 20. | " | 133 03 | 74 31 |
| 1886—Feb. | 11. | " | 45 60 | 25 04 |
| March | 26. | " | 84 28 | 45 66 |
| April | 12. | " | 147 25 | 79 54 |
| July | 20. | " | 62 39 | 33 00 |
| Oct. | 29. | " | 99 85 | 53 02 |
| Dec. | 20. | " | 78 40 | 39 80 |
| 1887—April | 9. | " | 161 50 | 79 5 |
| Nov. | 18. | " | 178 37 | 83 27 |
| 1888—May | 12. | " | 161 50 | 70 68 |
|  |  |  | $3,868 88 | $2,379 60 |

*Debit.*

|  |  |  |  | Int. to Feb. 1, 1897. at 5 per cent. |
|---|---|---|---|---|
| 1879— |  | Nothing | ......... | ......... |
| 1880— | " | " | | |
| 1881—Feb. | 23. | To cash | $3,034 00 | $2,418 20 |
| April | 12. | " | 35 15 | 27 80 |
| 1882—May | 13. | " | 766 00 | 563 30 |
| 1883—Jan. | 6. | " | 118 52 | 83 36 |
| Jan. | 15. | " | 59 26 | 41 60 |
| April | 7. | " | 20 22 | 14 02 |
| April | 11. | " | 131 42 | 90 85 |
| Nov. | 6. | " | 200 00 | 132 40 |
| Nov. | 27. | " | 117 52 | 77 02 |
| 1884— |  | Nothing | ......... | ......... |
| 1885—Oct. | 20. | To cash | 67 00 | 37 53 |
| Oct. | 22. | " | 20 00 | 11 30 |
| 1886—Feb | 11. | " | 20 00 | 10 95 |
| April | 13. | To cash | 30 00 | 16 15 |
| June | 17. | " | 90 60 | 48 13 |
| Oct. | 29. | " | 100 00 | 51 29 |
| Dec. | 30. | " | 78 40 | 36 78 |
| 1887—May | 5. | " | 25 00 | 12 10 |
| May | 10. | " | 25 00 | 12 08 |
| June | 16. | " | 10 00 | 4 75 |
| June | 21. | " | 1 50 | 73 |
| Nov. | 16. | " | 8 00 | 3 95 |
| Nov. | 19. | " | 20 00 | 9 25 |
| Dec. | 1. | " | 2 40 | 1 12 |
| 1888—Jan. | 17. | " | 20 00 | 9 07 |
| May | 18. | " | 10 00 | 4 95 |
| Dec. | 10. | " | 19 25 | 8 73 |
|  |  |  | $5,028 74 | $3,729 96 |

33

In the Matter of Leeds & Co., Limited, in Liquidation.

MRS. C. J. LEEDS IN ACCOUNT WITH LEEDS & CO., LIMITED.

*Debits.*

| | | | | | Int. at 5 per cent. to Feb. 1, 1897. |
|---|---|---|---|---|---|
| 1889— | | Nothing | | | |
| 1890— | | " | | | |
| 1891—Feby. | 16. | To cash | $1,000 00 | | $297 90 |
| 1892—Sept. | 14. | " | 10 00 | | 2 20 |
| Nov. | 4. | " | 100 00 | | 21 00 |
| 1893— | | Nothing | | | |
| 1894— | | " | | | |
| 1895— | | " | | | |
| | | | $1,110 00 | | $321 10 |

*Recapitulation.*

| | |
|---|---|
| Credits, firm No. 1 | $8,546 67 |
| Interest | 13,303 56 |
| Credits, firm No. 2 | 3,868 88 |
| Interest | 2,579 60 |
| Credits, corporation | |
| Total | $28,098 71 |
| Debits, firm No. 1 | 3,788 25 |
| Interest | 6,671 65 |
| Debits, firm No. 2 | 5,028 74 |
| Interest | 3,729 96 |
| Debits, corporation | 1,110 00 |
| Interest | 321 10 |
| Total | $20,659 70 |
| Deducting the totals | 28,098 71 |
| | 20,649 71 |
| Leaves | $7,449 01 |

The partnership of Leeds & Co. was first organized in 1850, and was composed of Edward Grinnell, Charles J. Leeds, Thomas L. Leeds and John Leeds; and it was subsequently reorganized in 1855 and again in 1858, with the same name and the same members; and there was a stipulation to the effect that in the event of its dissolution by the death of either partner, the same should continue between the survivors as the heirs of the deceased member.

But that in the event the parties in interest should be unwilling to continue, the surviving partners should have the right to purchase the property of the concern at a valuation to be ascertained by experts.

And, in pursuance of that stipulation, the partnership continued in existence until 1878, notwithstanding the death of several of the original members, when a liquidation and reorganization took place.

On July 31, 1878, there was a liquidation and settlement between Charles J. Leeds and John Leeds, surviving partners, and the heirs of Thomas Leeds and Edward Grinnell, whereby the entire assets of the concern were sold *in globo* to Charles J. Leeds, who assumed, as a consideration for the contract all the liabilities of the firm, and, at

the same time, Charles J. Leeds and Miss Julia Horn Leeds formed a partnership under the same name of Leeds & Co., in which the interest of Charles J. Leeds was fixed at nine-sixteenths and that of Miss Julia Horn Leeds was fixed at seven-sixteenths, and they agreed to become liable in that proportion for the debts of the old partnership.

And just here it is necessary to mention one of the contentions of counsel for the liquidators, pressed with great vigor and earnestness and very much relied upon by them; that is to say, that in this settlement and liquidation of the partnership the assumption by the new firm of the debts and the liabilities of the old firm was only good *pro tanto* as to all of said debts and liabilities, except that due to Mrs. Charles J. Leeds, for the reason that, as to that, Charles J. Leeds was incapacitated to acknowledge the debt and promise to pay the same.

But, in the first place, it is conspicuous that by this liquidation, settlement and reorganization, all of the *assets and property* of the partnership passed out of the old firm into the new, and remaining therein for a number of years, same was regularly transmitted to and incorporated into the corporation the liquidators represent; and it is by means of this extraordinary plea they propose to increase the distributive shares of one set of ordinary creditors out of the avails of these assets, to the *exclusion* of another—all of whose claims are otherwise well established.

This proposition was submitted to our learned brother of the lower court, and he most emphatically declined to accept it; and we have extracted from his exceptionally able opinion the following statement and make same a part of our opinion, viz.:

"It is said that when by the terms of the liquidation in July, 1878, Charles J. Leeds purchased the assets and assumed all the liabilities of the firm, which was then liquidated, and which was composed of Charles J. Leeds, John Leeds and the widows and heirs of Thomas. J. Leeds and Edward Grinnell, he, said Charles J. Leeds, assumed only the debts of the said firm, and that he was 'under a legal incapacity to contract any such obligation toward his wife, and as far as his contract attempted to create any obligation on his part toward his wife, it was forbidden by law and void.

"I am unable to follow out the reasoning which leads to this singular conclusion. The wife was a creditor of the juridical person—

age known as Leeds & Co., which was composed, as we have seen, of a number of persons. The assets of that firm constituted a common pledge for the security of all the creditors, including Mrs. Leeds, and by the terms of the contract by which the firm was liquidated, it was ascertained and agreed that these assets were more than sufficient to pay those debts. The amount that Charles J. Leeds was to pay for those assets was fixed and determined upon a comparison of the total of assets with the total of liabilities, and his assumption of the liabilities was part of the price which he was to pay for the assets. Can it be said that the husband can possess himself of property, pledged by a third person to his wife to secure a debt due her, under a contract by which he agrees to pay the debt, and yet incur no obligation to his wife? Was not the interest of Mrs. Leeds in the assets of Leeds & Co. paraphernal property, and did not that interest, with the assets themselves, pass into the possession and control of Mr. Leeds, and was it not used with said assets for the purposes of his business?

"It is said that Leeds & Co. No. 2 (composed of Charles J. Leeds and Miss Julia Horne Leeds), never, as a firm, assumed to pay the debts of Leeds & Co. No. 1 (composed of Charles J. and John Leeds, and Thomas J. Leeds and Edward Grinnell and the widows and heirs of the two latter).

"The evidence makes it apparent that the liquidation of Leeds & Co. No. 1, July 31, 1878, whereby Charles J. Leeds assumed all the liabilities of that firm, and the organization of Leeds & Co. No. 2, August 2, 1878, whereby Miss Julia Horne Leeds became a member of said firm, the interests of herself and partner were fixed at seven-sixteenths and nine-sixteenths respectively, and they bound themselves for the debts of the old firm in the same proportion— were substantially part and parcel of the same transaction. All the assets of Leeds & Co. No. 1, which Charles J. Leeds had acquired *in block*, subject to the condition that he should pay the debts of the concern, were by him immediately turned turned over, in block, to Leeds & Co. No. 2. And the new firm, knowing the conditions under which he held said assets, and the individual members specifically agreeing to fulfil those conditions to the extent of their respective interests in the firm, and as the consideration whereby the firm acquired said assets, neither the members nor the firm can deny their liability in the premises. Nor has there ever been any attempt

to deny such liability.   On the contrary, as has been stated already, Leeds & Co. No. 2 carried upon its books, as its creditors, those who appeared upon those books when they were used by Leeds & Co. No. 1, as the creditors of that firm.   Payments were made to them, deposits were received from them, interest was credited and capitalized; and the accounts as they stood upon the books of Leeds & Co. No. 1 were dealt with and treated in all respects as accounts to which Leeds & Co. No. 2 had succeeded and for which they were responsible.   So that, aside from the direct testimony of Mr. Leeds upon the subject, the evidence of the liability of Leeds & Co. No. 2 in the premises is overwhelming.   If anything further could be needed, it is to be found in the following stipulation in the contract between Charles J. Leeds and Miss Julia Horne Leeds, to-wit:

" ' Article I. The new copartnership shall commence on and be computed from the first day of the month of January, 1878.'   Thus making the new firm take the place of rather than succeed the old one.

" Proceeding further, we find that Miss Julia Horne Leeds died in 1881, and that, by judgment in this court of March 3, 1881, Mrs. Olivia B. Leeds was put in possession of her estate as universal legatee.   And, upon this basis, it was argued that there was a new firm, and that the new firm has never assumed the obligation of the old, etc.

" The contract between Charles J. Leeds and Miss Julia Leeds contained the following stipulation, to-wit:

" ' Article VII. In the event of the death of one of the copartners, the said partnership shall, nevertheless, continue (provided the same is agreeable to the survivor) between the heirs of the deceased and the surviving copartners, in the same manner and under the same conditions as if both were alive.'

" Mrs. Olivia B. Leeds, accordingly, as the sole instituted heir of Miss Julia Leeds, succeeded to her interest, and took her place in the existing firm of Leeds & Co., and the firm continued as thus constituted until 1889, when it was converted into a corporation, under the name of Leeds & Co., Limited, by act before Soniat, notary, June 18, 1889.   The corporators were Charles J. Leeds, Mrs. Olivia B. Leeds, widow of Thomas L. Leeds, Miss Grace Leeds, Thomas Leeds, Mrs. Louisa Leeds, wife of Norman Eustis, and Charles T. Leeds.

" As part, substantially, as the same transaction, and by act before the same notary, June 22, 1889, the establishment and plant known as 'Leeds' Foundry,' together with all the assets of Leeds & Co., were sold by that firm, represented by Charles J. Leeds and Mrs. Olivia B. Leeds, as the heir and successor of Miss Julia Horne Leeds, to the new corporation of Leeds & Co., Limited. And as part of the consideration for said sale the corporation assumed, after mentioning specifically certain debts of Leeds & Co., which appeared upon the mortgage certificate, ' all other debts and liabilities of the old firm of Leeds & Co., composed of Charles J. Leeds and Miss Julia Horne Leeds, per act of Charles T. Soniat, notary, dated the 2d of August, 1878.'

" Having reached the conclusion that the firm of Leeds & Co. No. 2 was liable for the debts of Leeds & Co. No. 1, and therefore liable for the debt to Mrs. Charles J. Leeds, it follows that Leeds & Co., Limited, in assuming the debts and liabilities of Leeds & Co. No. 2, and in taking the entire assets, claims and credits of that concern, became liable for the debt due to Mrs. Charles J. Leeds, unless that debt was paid or prescribed at the time of said assumption. It is not claimed, however, that said debt was paid, and the evidence shows its acknowledgment, by payments on account, from time to time, up to 1889, and thereafter, by the corporation itself as late as November, 1892, so that the prescription has never been completed."

But counsel for the liquidators insist that " a husband can not be a witness for or against his wife, except when he acts as her agent; and that he is not a competent witness to prove the creation of the agency, nor to prove any acts done by her, nor any contracts made with her by other persons."

Again:

" A husband, who is at the same time agent of his wife, and president (and therefore agent and trustee) of a corporation, can not make a contract with himself, by a mental resolution, nor by making entries in the books of the corporation; and that he is an incompetent witness to prove her ratification of his acts," etc.

As abstract propositions, the foregoing may be true, perhaps; but in our conception inapplicable to the facts of this case.

There was no effort to show that the husband, Charles J. Leeds, occupying the dual position of mutual mandatory of the partnership

In the Matter of Leeds & Co., Limited, in Liquidation.

first and the corporation afterward, and of his wife, had attempted to make any *contract* with his wife, or for his wife; it is the implied obligation of the partnership and of the corporation, as well as *their* contractual liability, which grew out of the transactions of the partnership and of the corporation, which Mrs. Charles J. Leeds has invoked and seeks to enforce—albeit, her husband was, at the same time, a member of one and a stockholder in the other.

It is elementary that the mere acceptance and personal use or investment in his own name of the wife's funds creates an indebtedness in her favor and against the husband; and, that the husband, being legally competent to administer his wife's separate paraphernal property, is a competent mandatory to perform acts of administration for her. It is equally true that, in such case, no formal written mandate is essential, but that acts and transactions of the husband, in the management of his wife's business, will suffice, if known to the wife, and is acquiesced in or approved by the wife.

Now, in this instance, the wife's separate funds went into the partnership first, and the corporation afterward, and were used and appropriated in their business—the husband being a member of the partnership and a stockholder in the corporation. Consequently, several important consequences flow from their transactions, viz.: (1) The establishment of the debt of the husband to the wife, he being one of the members of the partnership first, and one of the stockholders of the corporation afterward; (2) That said indebtedness remains absolutely imprescriptible, in so far as the husband is concerned, so long as the marriage exists, notwithstanding the wife is judicially separated from him in property; (3) same being the indebtedness of a commercial partnership, every member of the partnership was liable for its payment *in solido* (R. C. C. 2872); and (4) the acknowledgment of one debtor *in solido* "interrupts the prescription with regard to all others, and their heirs." R. C. C. 3532.

The legal result of the situation is, that the acknowledgment of the debt by the commercial partnership of Leeds & Co. had the effect of binding all the members *in solido;* and the various acknowledgments thereof during the subsequent years, of interrupting the current of prescription in respect to the partnership and as to the ndividual members thereof. And C. J. Leeds, personally, became bound by and through the legal acts performed by the partnership, of which he was a member; because the partnership is a fictitious and

ideal being, altogether independent of the individuals who compose it. This is evidenced by the books of the partnership and the accounts it rendered to its creditors, and which were tacitly acquiesced in through a long series of years, and whereupon were predicated a great many important business transactions. The partnership was competent to borrow money of Mrs. Leeds and to charge itself upon the books of the company, notwithstanding her husband was a member and *acted* as her agent at the time.

There existed no legal obstacle to his being the mutual mandatory of both lender and borrower.

This was the situation of affairs when the corporation was organized and took to itself the assets of the partnership and incurred the obligation of paying its debts, and upon which it subsequently paid one thousand one hundred and ten dollars.

Upon this subject the views of our learned brother of the district bench are so appropriate and conclusive that we extract same from his reasons for judgment and make them a part of our opinion, viz.:

"In all these transactions Mrs. Leeds had been represented by her husband, acting as her agent. It was he who, as her agent, received her paraphernal funds and placed them in her name and for her account in the business in which he was engaged. It was he who from year to year took cognizance of the making up of her account upon the books of the concern, and of the capitalization of the interest upon such occasions. Upon the other hand, it was Mr. Leeds who, in his capacity as a member of the different firms of Leeds & Co., and as an officer of Leeds & Co., Limited, made the entries upon those books, and it is said for this reason, that his acts as the agent of Mrs. Leeds are of no effect in her behalf.

"If this be true the only logical conclusion is, that if a man acting as the agent of another and having in his possession, for investment or otherwise, funds belonging to his principal, loans those funds in the name of his principal to a corporation of which he is an officer, and whose books he keeps, and the corporation uses the funds, it incurs no liability in the premises and can not be compelled to account for or return the money so used.

"I do not understand this to be the law. The dual position occupied by Mr. Leeds was no doubt one of great delicacy, but not more so probably than that of many brokers and others who are entrusted with money for investment. The transactions are of a char-

acter which entitle them to be determined upon their merits. And, considered in that light, the fact is that the corporation obtained assets in which Mrs. Leeds was interested, and undertook, in consideration thereof, to pay the debt due her, upon the same terms as accorded to all other persons similarly situated, save, indeed, that Mrs. Leeds was not given a note, which she might have negotiated to the inconvenience of the corporation. She was granted no better terms than the other creditors of Leeds & Co. No. 2, whose debts were assumed by Leeds & Co., Limited, and I conceive of no good reason why her present position should be any worse than theirs.''

But it is alleged by counsel of the liquidators that the corporation is insolvent, and that they, as the direct representatives of the *mass* of creditors, have both a right and an interest in setting up the defences which they have urged to the claim of Mrs. Leeds and other opponents, and those which neither Mr. Leeds nor the corporation could have urged against it. But this argument does not impress our minds at all favorably. The liquidators represent *all* the creditors equally, and to each they owe the same duty; and the creditors who are represented by liquidators exclusively derive their rights from and through the corporation and the prior partnerships—in the absence of any charge of fraud or collusion.

In Hall vs. Mulhollan, 7 La. 383, nothing more than that is said.

It is confidently claimed that the opinion of the District Judge and the contention of opponent's counsel are in antagonism to our decision in Calder & Co. vs. Their Creditors, 47 An. 1539. In the' course of our opinion, we said:

''It is a familiar rule, that an opposition to an account of a syndic or administrator puts the burden on the party whose debt is opposed, to sustain it by proof, and neither the admissions or books of the insolvent *alone* will make proof *against* creditors.'' (Our italics.) Citing White vs. Wilkinson, 12 An. 360; Lemos vs. Duralde, 3 Martin's New Series, 258.

In that case the books of the commercial partnership were introduced in evidence for the purpose of establishing debts *due to the partnership*, while in this case they were offered and are partially relied upon to prove an *acknowledgment by the partnership to its creditors*. This is a different proposition altogether from the one presented in the Calder case. We do not appreciate the force of

the argument, that acknowledgments of an indebtedness of a commercial firm can not be established by entries made in its books, particularly when same have been acquiesced in for many years as furnishing proof *against* it.

There is nothing in the views we have expressed which are at variance with those announced in Vance vs. Bank, *Ante* pp. 130, 378. The receivers represent the corporation of Leeds Company Limited, which had acquired by purchase the assets of a previously existing partnership, in which all accounts had been liquidated, and various settlements made acquiesced in, in the regular course of the dealings between them and their creditors, Mrs. C. J. Leeds among the number; and the obligations of which it had assumed in its organization act.

There is in this case no question of settlements between creditor and debtor *inter se.*

After a careful consideration of the law and evidence applicable to the claim of Mrs. Charles J. Leeds, we have reached the conclusion that it is correct; and we therefore concur in the opinion and decree of the judge *a quo.*

## II.

With reference to the claims of G. W. Beattie, J. B. Beattie, Mrs. P. B. Leeds, William Beattie, and Mrs. G. W. Noyes, which are listed in the commencement of this opinion, it may be observed that they all arise out of the same transaction, and may be cumulated and discussed together, all of them being represented by notes which were executed in their favor respectively by Leeds Company, Limited, and all bearing date April 1, 1894, in the liquidation and settlement of a prior indebtedness of Leeds & Co. The District Judge in his reasons for judgment made a careful summary of the testimony, which is found in the record, and stated his views thereon, and it compares favorably with the impression the evidence has given us, we therefore adopt it as a part of our opinion, viz.:

" John B. Beattie claims as the holder of nine notes of two hundred and fifteen dollars and twelve cents, made by Leeds & Co., Limited, April 1, 1894, and payable in from two to ten years, with interest from date at the rate of six per cent. per annum.

" Giles W. Beattie makes a like claim.

" William Beattie claims upon six notes of two hundred and fifteen

dollars and twelve cents each, made by Leeds & Co., Limited, April 1, 1894, and payable in from five to ten years, with interest from date at the rate of six per cent.

"B. R. Forman holds three notes, originally issued to William Beattie, dated April 1, 1894, and payable in two, three and four years; two for two hundred and fifteen dollars and twelve cents, and one for fifty-one dollars and fifteen cents. He alleges that he has advised the receivers not to acknowledge them as debts of Leeds & Co., Limited, but that if the court should conclude that the series to which said notes belong, a majority of which are held by William Beattie, should be recognized, then and in that case said notes should also be recognized.

"Mrs. Sarah Avery, widow of Paul B. Leeds, claims four thousand two hundred and eighty-five dollars and seventy cents as a holder and owner of nine notes made by Leeds & Co., Limited, to her order, dated April 1, 1894, and payable in from two to ten years, with interest at six per cent.

"Helen Leeds claims one hundred and eighty dollars as holder and owner of a note made by Leeds & Co., Limited, dated April 1, 1894, to the order of Mrs. G. W. Noyes, and by her endorsed, payable on demand, with interest at six per cent.

"These claims, as I understand the testimony, have the following origin:

"Jedediah Leeds, the father of Charles J., Thomas L. and John Leeds, established and owned the foundry. He married as his second wife Abbie E. Babcock, by whom he had two children, Paul and Grace, and thereafter died, leaving by will to his wife the sum of ten thousand dollars, and also the usufruct of other money, which, at her death, was to go to Paul and Grace.

"In some early settlement in the succession of Jedediah Leeds, as far back as 1852, the ten thousand dollars mentioned fell into the hands of John Leeds, who gave the widow his note for it secured by mortgage on his interest in the foundry. The interest on this note was paid by the firm of Leeds & Co., of which John Leeds was a member, and the note and mortgage were kept alive until 1877, when there was a balance of eight thousand seven hundred dollars still due, for which judgment was obtained with recognition of the mortgage and an order for its enforcement. As part of this suit, Leeds & Co. were garnisheed, and answered that John Leeds, the

defendant, really had nothing in their hands, having largely over-
drawn his account. Nevertheless the mortgage on the property
was recognized, as stated above, and as John Leeds' overdrafts on
the books were not placed of record as affecting his title to the real
estate and would not have affected the mortgage in question in any
event, it would seem that the judgment was good. Leeds & Co.,
however, as it appears, did not desire to have the interest of John
Leeds seized and sold under execution, as it would have forced
a dissolution and liquidation in a manner which would probably
have prejudiced the interests of all concerned. Upon the plaintiff,
who had by that time become Mrs. Beattie, consenting to forbear,
the firm assumed the debt, and appear to have thereafter carried it
on their books as a firm debt. In the liquidation and transfer, July
31, 1878, the mortgage in question, together with all others in-
scribed, was assumed by Charles J. Leeds, and upon his forming
partnership with Miss Julia Horne Leeds, the property was trans-
ferred to her to the extent of seven-sixteenths, as it stood. Later
on, June 22, 1889, when Charles J. Leeds and Mrs. Olivia B. Leeds
(heir of Miss Julia Horne Leeds) transferred the property to Leeds
& Co., Limited, the act, to which Mrs. Beattie was not a party,
recites that the mortgage was prescribed and was to be can-
celed; but it was not to be claimed in the course of the trans-
action by which the firm of Leeds & Co. became merged into
Leeds & Co., Limited, and the property of the former transferred
in block to the latter concern; that the claim of Mrs. Beattie was
prescribed. On the contrary, I infer that it stood as a recognized
subsisting claim, upon which interest had been paid regularly, upon
the books of Leeds & Co., and as such it was assumed by Leeds &
Co., Limited, as part of the price to be paid for the assets thus
acquired by that corporation. And it continued to be recognized
by Leeds & Co., Limited, until April 1, 1894, when the notes sued
on were given, in still further recognition. In explanation of the
notes it need only be said that after the death of Jedediah Leeds the
widow married Dr. James Beattie, and that she thereafter died, and
that the notes are held by her heirs or their transferees.

"The claim of Mrs. Paul Leeds differs somewhat in the details of
its history from the others. But the fact remains, with regard to her
claim, as with regard to the others, that the debt was assumed by
Leeds & Co. for a valuable and sufficient consideration, was uniformly

recognized by that firm and entered into the transaction by which Leeds & Co., merged into and transferred its property to Leeds & Co., Limited. After a while, and as late as 1894, Leeds & Co., Limited, in further recognition of said claim issued the notes sued on. The good faith of the parties claimant is indicated in the fact that they still hold the notes which were issued in April, 1894, whilst Leeds & Co. Limited, was a going concern, and appear to have made no effort to transfer them to third persons.

"I am of opinion that the opponents are entitled to recover, calculating both interest and discount upon the notes to their respective maturities." *   *   *

The foregoing presents a very clear elucidation of the Jedediah Leeds transaction and history of the legacy of ten thousand dollars he made to Abbie Babcock, his wife—same being the amount for which John Leeds gave his note and mortgage on his interest in the foundry. This note and mortgage being subsequently merged in a judgment for which Leeds & Co. became bound, the settlements which are represented by the notes in controversy were made in the interest of the corporation and to prevent a forced liquidation thereof.

Under this state of facts the corporation and its liquidators are unquestionably bound to opponents.

### III.

With reference to the claim of the opponent, Mrs. Charles J. Leeds, to be recognized as an ordinary creditor for such further and additional sum as may be due her, over and above her distributive share of the proceeds of the mortgaged property which was lately in controversy in the suit of New Orleans Canal and Banking Company vs. Leeds & Co., No. 12,211, we think her right is clear.

In that suit the court fixed the amount of Mrs. Leeds' claim at the sum of six thousand three hundred and sixty-nine dollars and thirty-five cents, with interest thereon at eight per cent. per annum from July 10, 1894, affirming a judgment of the District Court.

In casting up the account, the judge a quo made the following calculation, viz.:

*       *       *       *       *       *       *       *

In the Matter of Leeds & Co., Limited, in Liquidation.

" It appears from the sheriff's return that the different lots of ground and buildings covered by the mortgages and designated as Nos. 1. 2, 3, 4, 5, were sold under the fourth mortgage, for.. ............................. $31,359 49

" Deducting therefrom the amount of the first mortgage, with interest to June 24, 1895.................................................................................... 10,017 00

" And there is a balance of..........................................................................$21,342 49

" The second and third mortgages do not, however, cover the property— No. 5; hence, deducting the pro rata proceeds of that property............ 2,090 63

" And we have to pay second and third mortgages.................................$19,251 86

" The second and third mortgages, with interest to July 18, 1895, and costs, amount to..........................................................................$27,502 80

" Crediting same with proceeds as above ......................................... 19,251 86

" Balance due on second and third mortgages........................ $8,250 94

" Net proceeds of sale of property immovable by destination...................... 12,007 74

" Deduct balance due on second and third mortgages................................... 8,250 94

" Balance for distribution............................................................................ $3,756 80

" Net proceeds of property No. 5.................................................................. 1,813 79

" Total balance for distribution......... ................................................... $5,570 59

" Which balance being distributed pro rata in part satisfaction of the claims of the Canal Bank and of Mrs. Chas. J. Leeds, as fourth mortgage creditors, the bank for five thousand dollars and interest and Mrs. Leeds for six thousand three hundred and sixty-nine dollars and thirty-five cents and interest, amounts remaining unpaid constitute ordinary debts and should be so recognized."

\*       \*       \*       \*       \*       \*       \*

The judgment appealed from recognized the right of Mrs. Charles J. Leeds as ordinary creditor to be placed upon the provisional account for whatever sum may be found due after her pro rata share of the proceeds of the sale of the mortgaged property has been credited thereon; and it decreed her entitled to participate in the distribution of the proceeds, which the receivers have marshaled for distribution thereon, pro rata with other ordinary creditors.

In our opinion his judgment is correct.

IV.

The proof shows that Messrs. Carroll & Carroll, as attorneys at law, rendered services to the corporation, and participated in the court proceedings in which the liquidators were appointed, and represented them primarily.

It also appears that those proceedings were, in a great measure, inaugurated upon their advice.

The amount of six hundred dollars demanded appears to us to be quite reasonable, and there is no substantial ground assigned for the disallowance of same,

## V.

Messrs. Wood, Schneidau & Co. claim, as ordinary creditors, the sum of four thousand nine hundred and fifty-three dollars and twenty cents, and demand a distributive share of the fund proposed for distribution; but the judge *a quo* decreed that the receivers *hold in reserve for future distribution* whatever dividend may be attributable to such an indebtedness, in the event it be ascertained that so much is actually due or any portion thereof. Their answer to the appeal insists upon an absolute and present judgment decreeing them a distributive share.

Counsel for the receivers suggest that it is impracticable for the court to determine the question of amount until certain direct actions against them have been disposed of; and that the determination of same ought to be left open until the final account is filed.

We are of opinion that this is the proper course, especially in view of the reservation which the judge made in his decree.

The foregoing propositions are those which have been discussed in briefs and were argued at bar, and are the only ones about which there appears to have been any serious controversy.

Our investigation of the record has led us to the same conclusion at which the judge *a quo* arrived, and we therefore concur in his decree.

Judgment affirmed.

BREAUX, J., and MILLER, J., concur in the decree.